Municipal Court of Manchester, }
        June 24, 1937.          }

### STATE *v.* EUGENE GUERTIN.

*Thomas P. Cheney*, Attorney-General, and *Dudley Orr*, Assistant Attorney-General (*Mr. Orr* orally), for the State.

*Emile Lemelin* and *Ernest R. D'Amours* (by brief), for the defendant.

WOODBURY, J.   The defendant does not contend that the business in which he is engaged is one which the State is without power to

regulate. His position, as stated in his brief, is as follows: "(1) The City of Manchester has no power to fix rates. (2) Power to *license and regulate* does not include authority to require taximeters. (3) The ordinance is discriminatory. (4) The ordinance leaves too much to the discretion of the licensing authorities. (5) The ordinance is generally unreasonable."

The defendant, by his own admission, is engaged in the business of a common carrier for hire. The rates of fare which he may charge are therefore subject to legislative control by the State without infringing any of his constitutional rights. *State* v. *Railroad*, 77 N. H. 425, 426, 427; *Terminal Taxicab Co.* v. *Commission*, 241 U. S. 252; *Yellow Taxicab Co.* v. *Gaynor*, 82 Misc. (N. Y.) 94. The defendant contends, however, first, that these regulatory powers cannot be delegated by the State to a municipality, and, second, that the statutes of this State do not authorize either cities or towns to regulate any common carrier in respect to rates of fare.

The ordinance in question does not, by its terms, apply to all common carriers by automobile who operate within the city. It excludes from its provisions all motor vehicles "subject to regulation by the Public Utilities Commission [*sic*. Public Service Commission], of the State of New Hampshire, sight-seeing busses designed to carry eight or more persons from a fixed place to places of interest about the City, motor vehicles collecting fares by tickets or coupons sold for interstate transportation." It includes within its terms only such motor vehicles as may be used "for the conveyance of persons for hire from place to place within the City of Manchester." The ordinance is clearly applicable to the business of operating taxicabs as that business is ordinarily conducted, and as the defendant does in fact conduct it, and it applies only to the prosecution of that business within the geographical limits of the city of Manchester. That this is a matter primarily of local concern is not open to question, and as to such matters "The legislature may constitutionally authorize city councils to legislate . . . ." *Coleman* v. *School District*, 87 N. H. 465, 471; *Sherburne* v. *Portsmouth*, 72 N. H. 539, 542; *State* v. *Noyes*, 30 N. H. 279, 293.

We need not inquire whether towns (P. L., c. 42, s. 30), and in consequence cities (P. L., c. 54, s. 1; *Lucier* v. *Manchester*, 80 N. H. 361, 362), have been authorized by the legislature to fix rates for the kind of transportation here involved. Such powers as cities have in the premises spring from a statute applicable to cities alone. P. L., c. 54, s. 12, *par.* VI. By virtue of this paragraph of the above statute

cities are given power "To license and regulate porters, cartmen and cartage, runners for boats, stages, cars and public houses, hackney coaches, cabs and carriages, and their drivers." The regulatory powers here granted are not limited to horse drawn vehicles but may be exercised by city governments in respect to taxicabs (*State* v. *Dunklee*, 76 N. H. 439), but the question remains as to whether or not the powers granted include the power to regulate rates. We believe that such power is included within the meaning of the words used.

The word "regulate" is a broad one. It means "Adjust or control by rule, method or established mode; to direct by rule or restriction; to subject to governing principles or laws." Webster, New International Dictionary. The word itself contains no suggestion of any limitation as to the features which may be regulated, and no inference of any such limitation can be drawn from the context in which it is used in the statute.

In section twelve the word "regulate" appears twelve times. Upon six occasions it is followed by words of limitation; upon six occasions it is not. For illustrations of its limited use see paragraph viii in which power is given "To regulate the keeping, conveying and places of deposit of gunpowder and other combustible and dangerous materials," and "to regulate the erection or use of buildings within the most compact part of the city." Similarly in paragraph xi power is given to "regulate the place and manner of selling and weighing" various commodities.

Having used the word "regulate" upon six occasions in the section of the statute under consideration in connection with other words limiting its scope, it is to be assumed that the legislature, when using the word without limitation intended to use it broadly. This does not mean that upon every occasion when the word "regulate" is broadly used in the statute it is to be construed in such a way as to confer upon a city powers of rate regulation over the business to which it refers. To give it such a construction would be to violate the rule that statutes are to be construed whenever possible in such a way as to render them constitutional, and over some of the businesses in relation to which the word "regulate" is used without limitation the State possesses no rate regulatory powers.

As used without words of limitation the word includes all powers of regulation which the State may constitutionally exercise and among those powers is undoubtedly included the power to regulate the rates of common carriers. Such powers had frequently been exercised by the State at the time when the statute was first enacted

in its present general form in 1867 (C. S., *c.* 150, *s.* 31; Laws 1844, *c.* 128, *s.* 13; Laws 1855, *c.* 1666, *s.* 1; G. S., *c.* 149), and we find nothing in its terms which tends to indicate that powers of rate regulation over common carriers by cab, hack or taxicab were intended to be withheld from a city. These powers have reference to matters primarily of local concern, and so may constitutionally be delegated to a city. We are, therefore, of the opinion that the Board of Mayor and Aldermen of Manchester are authorized to establish rates of fare for taxicabs operating within the city limits.

The provision in the ordinance requiring that taxicabs be equipped with taximeters is obviously valid. It is a regulation designed and reasonably necessary to insure adherence to the rates prescribed. It may also be supported upon grounds independent of the rate making power of the city. Whatever the origin of the rate of fare may be, whether it is established by governmental authority or by the carrier, the requirement of a taximeter is appropriate to insure that the schedule of charges will be strictly adhered to and that fares will be honestly and accurately computed.

The defendant's remaining contentions may be briefly disposed of. There is no delegation of legislative power to the executive department of the city government as he seems to contend. There is no delegation of any power at all to that department. All control over the issuing of licenses is expressly retained by the Board of Mayor and Aldermen. They and they alone have power under their ordinance to grant or withhold a license and the conditions precedent which must be complied with by an applicant before a license may be granted to him are fully, clearly and definitely set forth. There is no suggestion in the agreed facts that the board has acted capriciously in denying a license to the defendant, or that the rates of fare which it has prescribed are unreasonable, and the fact that at some future time or upon some future occasion the board may be derelict in its duty is no ground for invalidating the ordinance.

The defendant's contentions that the ordinance is both discriminatory and generally unreasonable are also without merit. This argument appears to be based upon the fact that the ordinance excepts from its provision requiring a taximeter "Cars for hire used for conveying passengers for attendance at marriages or funerals or christenings or for use in ceremonial parades," and excludes entirely from its provisions cars used for sight-seeing purposes. Cars used for the above purposes are put to a use quite different from that for which taxicabs are ordinarily used. The Board of Mayor and Aldermen

may well have considered that there was no necessity that cars so used should be regulated in the same way as cars used as taxicabs. The classification appears to be a reasonable one, it is not arbitrary, it is based upon substantial distinctions and is "germane to the purpose of the law." *Woolf* v. *Fuller*, 87 N. H. 64, 73. *Opinion of the Justices*, 85 N. H. 562, 564. The constitutional requirement of equality under the law is, therefore, not violated by the ordinance under consideration.

*Appeal dismissed.*

All concurred.